

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ABDUL KARIM PIRANI, | § | Case No. 12-41916 |
| | § | (Chapter 11) |
| Debtor. | § | |
| ————————————————— | § | |
| | § | |
| ABDUL KARIM PIRANI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Proc. No. 12-4114 |
| | § | |
| MALIK BAHARIA, ABDUL HAMID | § | |
| GILANI, NADIRSHA LALANI, and | § | |
| HNM PARTNERS, LLC, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON REMAND**

The Fifth Circuit remanded this adversary proceeding for additional consideration of two

issues:  (1) whether a foreclosure deficiency exists for which HNM Partners, LLC is liable, and

(2) what percentage of the defendants' attorney's fees is attributable to their breach of contract

claim.  *See Matter of Pirani*, 824 F3d 483 (5th Cir. 2016).  The Court conducted a hearing on the

remanded issues over three days in July 2017.  The Court, having considered the evidence

introduced at the original trial in 2013, as well as the supplementary evidence introduced at the

hearing on remand, makes the following findings of fact.

**I. FINDINGS OF FACT**

1.      As the Court explained in its original opinion, Abdul Pirani and his brother, Aziz,

formed Circle Sherman LLC on November 25, 2008, for the purpose of owning a Days Inn hotel

1

in Sherman, Texas.  The hotel was a full-service hotel with 140 rooms, a pool, conference areas, and a restaurant.

2.       Aziz and Pirani proposed to Malik Baharia, Abdul Hamid Gilani, and Nadirsha Lalani that they purchase a 50% membership interest in Circle Sherman.   Baharia, Gilani,  and Lalani formed HNM Partners, LLC for the purpose of holding their 50% membership interest in Circle Sherman.

3.       On or about February 6, 2009, Baharia, Gilani and Lalani paid $475,000.00, through HNM, to or on behalf of Circle Sherman.  On the same date, Circle Sherman executed a promissory note in the principal amount of $2,456,415 for the benefit of One World Bank ("OWB") in order to obtain funds to purchase and renovate the hotel.  Pirani, Aziz and HNM signed the promissory note.   In addition, Pirani, Aziz, HNM, and HNM's three individual members each guaranteed Circle Sherman's obligations to OWB under the Note.

4.       The promissory note was secured by a deed of trust.  In the event of a foreclosure on the hotel, and a suit for a deficiency, paragraph 3.10 of the deed of trust provided that the fair market value of the hotel would be determined as follows:

> The following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time): (i) the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than twelve (12) months following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance, a survey of the Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including, without limitation, utilities expenses, property management fees,

2

taxes and assessments (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five (5) years' experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

5.       After purchasing the hotel, Pirani, Aziz, HNM, and HNM's members immediately had a falling out about the use of funds for the renovation of the hotel.  HNM filed *Plaintiff's Original Petition, Application for Temporary Restraining Order and Permanent Injunction, and Request for Appointment of Temporary and Permanent Payment Receiver* against Pirani, Aziz, and Circle Sherman in the 134th Judicial District Court of Dallas County, Texas.  Aziz and Pirani filed a counterclaim against HNM and a third-party petition against HNM's members.  On July 27, 2009, Pirani, Aziz, and Circle Sherman entered into a settlement agreement with HNM and HNM's members wherein Pirani and Aziz agreed to return HNM's investment by re-purchasing HNM's membership interest for $475,000, among other things.

6.       With respect to HNM, paragraph 3.1 of the settlement agreement provided in pertinent part as follows:

> Until the Purchase Price (including any interest and sales profit) is paid in full to HNM, HNM shall retain its Membership Interest in the Company. Notwithstanding the foregoing, HNM shall not be liable for any losses incurred by [Circle Sherman] nor be entitled to any profits of [Circle Sherman] and shall not be subject to any capital calls by [Circle Sherman].

In addition, paragraph 4.1 provided in pertinent part as follows:

> [Circle Sherman and Pirani] forever release and discharge HNM Partners, LLC, of and from any and all claims, damages, losses, demands, liabilities, costs, expenses, actions, causes of actions, suits, damages, judgments of any kind, type or nature whatsoever, in law or in equity, whether known or unknown, which against HNM [Circle Sherman] ever had, now has or hereafter can, shall or may have, **relating to the subject matter of the Litigation to the date of this Agreement** SAVE AND EXCEPT the continuing obligations of HNM under this Agreement.

(Emphasis added.)   The settlement agreement defined "Litigation" as HNM's original petition, the counterclaim by Pirani and Aziz, and the third-party petition against HNM's members.

7.      With respect to the individual defendants, paragraph 3.2 of the settlement agreement provided as follows:

> In the event that [Circle Sherman] obtains a third party investor for the purpose of purchasing HNM's Membership Interest, [Circle Sherman] shall in good faith make best efforts to have the Bank release Gilani, Baharia and Lalani from their personal guaranties of the loan.  If [Circle Sherman] is unable to obtain a release from the bank of the guaranties, Gilani, Baharia and Lalani agree to continue to be guarantors of the Loan until July 9, 2012, at which time they shall be released either through [Circle Sherman's] refinancing of the Loan or sale of the Hotel.

8.      Paragraph 6.7 of the settlement agreement provided that the prevailing party in any action brought to enforce any term or provision of the agreement would be entitled to reasonable attorney's fees and expenses from the other party.

9.      Pirani and Aziz (through Circle Sherman) spent several months renovating the hotel.  The estimated cost of the renovation and repairs was approximately $1.1 million.

10.     On February 17, 2010, Days Inn Worldwide ("Days Inn") issued a notice to Circle Sherman of quality assurance defaults.

11.     Circle Sherman began to market the hotel for sale in or around April 2010.  The marketing was based, in part, on an appraisal that represented the market value of the hotel as $4.5 million.

12.     In June 2010, Circle Sherman defaulted on payment of the note to OWB.

13.     In late July or August 2010, OWB filed a state court suit against Pirani, Aziz, HNM and HNM's three individual members as guarantors of the loan to Circle Sherman.  OWB asserted claims for breach of the note and guaranty agreement.  HNM and its members obtained counsel, and Pirani and Aziz obtained different counsel.

14.     HNM and its members (Baharia, Gilani, and Lalani) believed that they already should have been released from any obligation under the note and guaranty agreement pursuant to the settlement agreement.   However, Pirani, Aziz, HNM, and HNM's members initially presented a united front to OWB and coordinated their defense in OWB's guaranty suit.

15.     On August 24, 2010, Days Inn issued another notice of quality assurance defaults to Circle Sherman.

16.     The local property appraisal district assessed the value of the hotel at $2,420,500 for 2010.

17.     On October 4, 2010, Circle Sherman filed for bankruptcy under chapter 11 of the Bankruptcy Code.   In Circle Sherman's "Schedule A – Real Property," Circle Sherman stated that the hotel had a value of $3,500,000.00.[1]   The value listed in Schedule A was consistent with Circle Sherman's 2011 tax return, which reported a value of $3,543,834 for the hotel.

18.     OWB filed a motion for relief from the automatic stay in Circle Sherman's bankruptcy case so that it could foreclose on its interest in the hotel.   In its motion, OWB stated that the total amount due and owing to it was $2,638,981 as of October 4, 2010 (exclusive of *ad valorem* taxes, reasonable attorneys' fees, and later accruing interest).   This Court entered a final order granting OWB's motion on June 24, 2011.

19.     Foreclosure occurred on August 2, 2011.   Approximately forty rooms were not in service at the time of foreclosure, and the hotel needed significant repairs.

20.     OWB was the only bidder at the foreclosure auction.   OWB bid $2,350,000 for the hotel and credited that amount against Circle Sherman's obligations to OWB under the note.

21.     On August 8, 2011, this Court dismissed Circle Sherman's bankruptcy case.

---

[1] Notably, Pirani signed and approved Schedule A under penalty of perjury as the "Manager" of Circle Sherman.

22.     Circle Sherman's 2011 tax return included $902,402 in losses as a result of the foreclosure of the hotel as well as $128,000 in operating losses.  Pirani represented himself as the sole member of Circle Sherman and claimed all the tax benefits from Circle Sherman's losses.

23.     Pirani has used Circle Sherman's losses to offset his income on his personal income tax return.  At trial, his accountant testified that the losses Circle Sherman claimed on its tax return are the same losses Pirani originally attempted to collect from his co-guarantors in this adversary proceeding.   The losses include Circle Sherman's defaulting on the loan, the foreclosure, unpaid property taxes, late fees, appraisal fees, etc.

24.     On August 19, 2011, in OWB's state court guaranty suit, Pirani, Aziz, HNM and HNM's members filed a "Motion for Determination of Fair Market Value" pursuant to § 51.003 of the Texas Property Code.   They relied on an appraisal of the hotel by Galbraith and Associates, Inc., which concluded that the "as is" value of the hotel as a "going concern" as of May 27, 2011 was $3,290,000.

25.     On September 28, 2011, in the state court litigation, Baharia, Gilani, Lalani and HNM brought a cross-claim against Pirani and Aziz for breach of their obligations under the settlement agreement, specifically, failure to release them and re-purchase HNM's membership interest in Circle Sherman for $475,000.

26.     In November 2011, HNM and HNM's members modified their original fee agreement with their state court counsel, Collin Porterfield.  They converted from an agreement to pay Porterfield $350 per hour, plus expenses, to an agreement to pay him $5,000 per month, plus expenses, for the next five months through the trial scheduled for March 2012.  They also gave Porterfield a 25% interest in their claim that Pirani and Aziz had breached the settlement agreement.

6

27.     In February 2012, Baharia, Gilani, Lalani and HNM won a partial summary judgment on their claim that Pirani and Aziz had breached the settlement agreement by failing to re-purchase HNM's membership interest in Circle Sherman.

28.     On March 6, 2012, the day before the scheduled trial of OWB's guaranty suit, OWB announced to the state court that it had settled with Pirani.  Pirani paid $300,000 to OWB (using funds from personal and business accounts).  In exchange, OWB executed an assignment dated March 6, 2012, whereby OWB assigned, among other things, its claims against all of the defendants in the pending guaranty action to a company owned and operated by Pirani (DFW Fuel City, Inc.).

29.     After obtaining the assignment of the note and guaranty from OWB, Pirani failed to release the individual defendants from their guaranties.  This Court previously found that Pirani breached his obligations to the individual defendants under the settlement agreement by failing to release them once he had the power to do so.  The Fifth Circuit affirmed.

30.     On March 7, 2012, Pirani did not appear for the trial of OWB's claims for breach of the guaranty agreement.  The state court entered a final judgment of dismissal of OWB's claims on March 7, 2012.  The original dismissal was with prejudice.  After the dismissal, Pirani (through DFW Fuel City, Inc.) filed a motion requesting that the state court amend the dismissal order to be without prejudice so that he could pursue OWB's deficiency claim against his co-guarantors.  The state court entered an amended judgment on April 17, 2012, providing that the dismissal was without prejudice.

31.     On March 7, 2012, contemporaneously with the original judgment of dismissal, the state court entered a separate order that severed a pending dispute over the partial summary judgment previously awarded against Pirani and Aziz.  In particular, Pirani and Aziz had

requested reconsideration of the partial summary judgment.  On May 21, 2012, the state court granted reconsideration and set aside its prior summary judgment as to attorney's fees only. Thereafter, HNM and its members filed an amended petition, removing their claims for attorney's fees.

32.     Pirani (through DFW Fuel City, Inc.) moved to intervene in the severed action as well as for a new trial.  HNM and its members objected to the attempted intervention and moved for sanctions.

33.     On June 14, 2012, the state court entered an Agreed Final Judgment awarding Baharia, Gilani, Lalani and HNM a judgment against Pirani and Aziz, jointly and severally, for actual damages in the amount of $475,000 for the buy-out of HNM's membership interest in Circle Sherman.  The agreed final judgment also awarded HNM and its members the $45,000 they had previously paid to Pirani's attorney and $96,181.16 in pre-judgment interest based on the agreed contract rate.

34.     Porterfield's billing records reflect that he did not charge his clients for attorney's fees in the severed action from March 2012 through June 2012.  He only billed HNM's members for his expenses during this period.

35.     Meanwhile, OWB had been marketing the hotel for sale.  OWB paid $88,697.88 in *ad valorem* taxes due for 2009 in September 2011, and OWB paid $62,647.01 in *ad valorem* taxes due for 2011 in December 2011.[2]

36.     On or about May 1, 2012, OWB sold the hotel to 9InnTexas, Inc. for the contract sale price of $1,500,000.  OWB financed the sale.

---

[2] On January 31, 2012, OWB also paid $187.32 in business and personal property taxes relating to the hotel's restaurant.

37.     Pirani filed a personal bankruptcy petition under chapter 11 of the Bankruptcy Code on July 27, 2012.  Pirani was solvent on the petition date.

38.     Pirani initiated this adversary proceeding the next day.  In his complaint, he sought to collect approximately $1 million from his co-guarantors based on their alleged breach of their guaranty of Circle Sherman's obligations to OWB.  He brought his complaint as the successor-in-interest to OWB.

39.     HNM and its members responded with numerous affirmative defenses.  In addition, they asserted counterclaims for breach of fiduciary duty and breach of the settlement agreement.

40.     In or around September 2012, Porterfield began charging his clients a $4,000 per month flat fee plus his expenses.

41.     HNM and its members filed proof of their claims against Pirani during the pendency of this adversary proceeding.  They attached a copy of the agreed final judgment. Their proof of claim also referenced an "unliquidated counterclaim" in this adversary proceeding, which they valued at an estimated $200,000.

42.     In his confirmed plan of reorganization, Pirani proposed the following treatment of the claims of HNM and HNM's members:

Class 10 Claims.  The Class 10 Claims will be treated as follows:

This Class consists of the Claims of Malik Baharia, HNM Partners LLC, Abdul Hamid Gilani, Nadirshah Lalani holding in the aggregate a judgment claim of $616,181.00 against the Debtor. This Claim is disputed and subject to an offset and recoupment by the Debtor in an amount in excess of $900,000.00. Debtor has filed an adversary proceeding in his Bankruptcy Proceedings against Claimants. To the extent that Claimants are determined to have an Allowed Claim against Debtor, Debtor shall pay the Allowed Claim of Claimants the full amount of their Allowed Claim in sixty equal monthly instalments of principal and interest at the rate of [seven point five per cent (7.5%)] per annum on the unpaid principal

amount commencing thirty days following entry of a final order allowing such Claim.

43.     The Court entered the parties' joint pretrial order on September 18, 2013. In the joint pretrial order, HNM and its members challenged the fair market value of the hotel. They thereby asserted an affirmative defense that the hotel was worth more than the debt to OWB and, therefore, there was no deficiency. HNM and its members also asserted counterclaims that Pirani had violated his fiduciary duties to them and that he had breached the settlement agreement by failing to release them from their guaranty of Circle Sherman's indebtedness to OWB.

44.     HNM argued at the original trial that it was released by the language in paragraph 3.1 of the settlement agreement stating that it "shall not be liable for any losses incurred by the Company nor entitled to any profits of the Company, and shall not be subject to any capital calls by the Company." Circle Sherman claimed the costs associated with OWB's foreclosure as a loss on its 2011 tax return. Thus, according to HNM, Pirani breached his obligations under the settlement agreement by seeking to collect from HNM for the alleged foreclosure deficiency.

45.     In its memorandum opinion following trial, this Court concluded that Pirani could not seek to profit by purchasing OWB's deficiency claim for $300,000 and then suing his co-guarantors for the full amount of the alleged deficiency from the foreclosure of the hotel. Further, this Court held Pirani could not seek to collect a contributive share from HNM, Baharia, Gilani, Lalani, because he had promised to release them in paragraph 3.2 of the settlement agreement.

46.     The Fifth Circuit affirmed that Pirani was limited to seeking to collect his co-guarantors' contributive shares of the $300,000 he paid for the note and guaranty. However,

with respect to the release of HNM, the Fifth Circuit reversed.  HNM was not included in the release language in paragraph 3.2 of the settlement agreement.

47.    Since this Court's original opinion did not determine the fair market value of the hotel at the time of foreclosure, the Fifth Circuit remanded the issue of whether or to what extent a foreclosure deficiency existed.  If so, then HNM could be liable for its proportionate share of the $300,000 Pirani paid to OWB to purchase the note and guaranty agreement.  The Fifth Circuit explained that, as one of six guarantors, HNM's contributive share would be $50,000.

48.    At the original trial, the parties disputed the value of the hotel.  Pirani entered into evidence the Milkes Realty Valuation Appraisal Report dated February 11, 2013, which stated that the "as is" fair market value of the hotel as of August 2, 2011, was $1,390,000.  However, portions of Milkes' report placed the hotel in the wrong city and inaccurately described the year it was built.  In addition, Milkes was not provided with any information regarding the income generated by the hotel's restaurant to use in preparing his report.  Milkes testified that he ignored the restaurant in his report, because he did not believe it was economically feasible for the hotel to operate as a full-service hotel.

49.    HNM and its members introduced the Galbraith appraisal at the original trial.  However, Galbraith testified that his appraisal was inconsistent with paragraph 3.10 of the deed of trust, because, among other things, he included $250,000 in future renovations in calculating the room rate and expected income from the hotel.

50.    On remand, HNM and its members supplemented the original trial record regarding the value of the hotel with an appraisal report by Michael W. Massey & Associates.

51.    Although approximately 40 rooms out-of-service at the time of foreclosure, Massey was asked to appraise the property as a fully-functioning, 140-room hotel.  He testified

that Porterfield provided him with information indicating that the hotel required $250,000 in repairs and deferred maintenance at the time of foreclosure in order to bring all the rooms online.[3]  After deducting $250,000 for repairs, Massey estimated that the retrospective market value of the hotel was $3,300,000 on the date of foreclosure.[4]

52.    Massey testified that the value would have been much lower, possibly in line with the valuation by Milkes, if he had valued the hotel using the guidelines set out in paragraph 3.10 the deed of trust.

53.    HNM and its members also seek their attorney's fees and costs as part of their claim against Pirani.  Porterfield, testified briefly at the original trial.  He testified at length at the hearing on remand, and he introduced additional exhibits regarding his fees and costs.

54.    HNM and its members are seeking all of the time Porterfield spent in the state court guaranty action, not just what he billed them, as their actual damages caused by Pirani's failure to release them.  Porterfield testified that he spent 350 hours (at $350 an hour), for a total requested damages award of $122,000 in attorney's fees, defending his clients in state court from the guaranty action.[5]  The requested award encompasses the time Porterfield spent from the inception of OWB's guaranty action through Pirani's post-dismissal motions.

55.    HNM and its members also seek an award of their attorney's fees for successfully enforcing their claim for breach of the settlement agreement in this Court.  Porterfield testified

---

[3] Massey did not visit the interior of the hotel for his appraisal.  Instead, he relied on his knowledge of the hotel's interior gleaned from meetings with clients over the years in the hotel's restaurant.  He testified that these visits occurred prior to 2009.

[4] Massey did not know the post-foreclosure sales price OWB obtained for the hotel, and he did not include information about the sale of the hotel to 9InnTexas in his appraisal.

[5] The defendants are not seeking to recover for the time Porterfield spent on their breach of fiduciary duty cross-claim in state court.  Porterfield testified that he reduced his fees to remove time relating to the breach of fiduciary duty cross-claim his clients asserted against Pirani during OWB's guaranty action.  Porterfield also testified that HNM and its members are not seeking to recover for the time he spent pursuing the defendants' claim for Pirani's breach of his promise to re-purchase HNM's membership interest for $475,000.

that he spent 291.4 hours (at $350 an hour) for a total award of $101,990 for the initial part of this adversary proceeding.  Porterfield testified that all of this time was spent enforcing the claim for breach of the settlement agreement and that he has spent another 85.8 hours on remand.

56.     With respect to apportionment of the time spent on the breach of fiduciary claim and the breach of contract claim, Porterfield testified that the claim for breach of fiduciary duty was a secondary claim that he included in the complaint and pre-trial order in this adversary proceeding.  He testified that he "cut and paste" the breach of fiduciary duty claim from materials he had prepared for the state court litigation and that he did not spend any time developing or specifically pursuing the breach of fiduciary duty claim in this proceeding.  Thus, HNM and its members request the full amount of Porterfield's attorney's fees through the date of the original trial in this adversary proceeding in the amount of $101,990, plus his fees incurred in connection with the hearing on remand in the amount of $30,030, for a total award of $132,020.

57.     HNM and its members intend to submit a separate request for the costs and attorney's fees they have incurred on appeal.

With these facts in mind, the Court makes the following conclusions of law.

## II. CONCLUSIONS OF LAW

### A. Is HNM Liable for a Deficiency?

1.     In this adversary proceeding, Pirani originally sought to stand in OWB's shoes and hold HNM liable for the full amount of the deficiency suffered by OWB.  The Fifth Circuit held that, as a co-guarantor, Pirani could only recover HNM's contributive share of the $300,000 Pirani paid to OWB for the note and guaranty.

2.     On remand, HNM argues that it is not liable for its contributory share of the $300,000 based on the state court settlement agreement.  In particular, HNM argues that it was

13

effectively released by the settlement agreement, which provided in pertinent part that that "HNM shall not be liable for any losses of [Circle Sherman]."

3.      The settlement agreement does not define the term "losses."  HNM argues that the term should be interpreted to mean "business losses," including all amounts due on the note and any associated expenses claimed by OWB, such as operating expenses and taxes.  *See Putnam v. CIR*, 352 U.S. 87 (1956) (amount paid by guarantor on a loan made by his company is a short term capital loss for the guarantor).

4.      However, Pirani is not seeking to hold HNM liable for the expenses or business losses of Circle Sherman.  Pirani is seeking contribution from HNM as a co-guarantor.  For the reasons explained by the Fifth Circuit, because Pirani and HNM are co-guarantors, Pirani's recovery against HNM is limited to HNM's contributive share of the $300,000 he paid to OWB to purchase the deficiency claim.

5.      HNM also argues that Pirani is barred from any recovery against it based on the doctrine of quasi-estoppel.  Under Texas law, quasi-estoppel "forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects."  *Davidson v. Davidson,* 947 F.2d 1294, 1297 (5th Cir. 1991) (internal citations omitted).  "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."  *Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 864 (Tex. 2000).  Thus, quasi-estoppel forbids a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects.  *Mexico's Indust., Inc. v. Banco Mexico Somex, S.N.C.,* 858 S.W.2d 577, 581 n. 7 (Tex.

App. -- El Paso 1993, writ denied); *Turcotte v. Trevino,* 499 S.W.2d 705, 712–13 (Tex .Civ. App. -- Corpus Christi 1973, writ ref'd n.r.e.).

6.      The elements of quasi-estoppel are: (1) the party being estopped acquiesced to or benefited from a position inconsistent with his present position; (2) it would be unconscionable to allow the party being estopped to maintain his present position; and (3) the party being estopped had knowledge of all material facts at the time of the conduct on which estoppel is based. *See, e.g., In re Liao*, 553 B.R. 584, 607 (Bankr. S.D. Tex. 2016) (citing cases).

7.      Here, HNM argues that "Pirani is estopped from claiming HNM owes him anything under the Guaranty because he has already taken personal benefit of 100% of the very same losses he now asserts HNM should pay."   HNM further argues that Pirani "has already received the benefit of the losses at the expense of HNM … and it would be unconscionable to allow him to claim a further windfall when he agreed HNM was not even responsible for the losses."   According to HNM, Pirani's "claim fails as a result of his agreement that HNM is not liable for losses and the fact that [Pirani] already has benefitted from over $1 million in tax deductions from those losses."

8.      Pirani and Aziz entered into a settlement agreement with HNM wherein they promised to re-purchase HNM's membership interest in Circle Sherman.  They breached their promise, and the state court entered a judgment against them for $475,000, among other things. The state court judgment restored HNM to the position it would have had if Pirani and Aziz had honored their promise to re-purchase HNM's membership interest in Circle Sherman.  If Pirani and Aziz had re-purchased HNM's membership interest for $475,000 as set forth in the settlement agreement, HNM would not have been a member of Circle Sherman entitled to claim any interest in Circle Sherman's tax losses.

9.      The Court, therefore, concludes that Pirani is not estopped from seeking to recover from HNM a contributive share of the $300,000 he paid to OWB to purchase the deficiency claim.  Further, assuming there was a foreclosure deficiency, Pirani's confirmed plan provides that HNM's contributive share, $50,000, should be netted against the unsecured claim asserted by HNM and its members.

## B. Was There a Deficiency?

10.     Next, HNM raises as an affirmative defense that there was no deficiency at the time of foreclosure and, therefore, that it is not liable to Pirani for any portion of the $300,000 he paid to OWB to purchase the deficiency claim.

11.     OWB purchased the hotel with a credit bid of $2,350,000 at a non-judicial foreclosure sale following Circle Sherman's default on the note.  At the time of foreclosure, according to the evidence presented at the original trial, $3,178,190.13 was due and owing under the note, leaving a deficiency of $828,190.13.

12.     Under Texas law, if the price at which real property is sold at a foreclosure sale is less than the unpaid balance of the indebtedness secured by the property, resulting in a deficiency, an action may be brought to recover the deficiency.  *See* TEX. PROP. CODE § 51.003(a).  Any person sued for recovery of such a deficiency may ask the trial court to determine the property's fair market value as of the foreclosure-sale date and, if the property's fair market value is greater than the sale price, the person being sued is entitled to an offset.  *See id.* § 51.003(b), (c).

13.     "Fair market value" is not defined in chapter 51 of the Texas Property Code.  The historic measure of "fair market value" is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but

is under no necessity of buying." *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 556 (Tex. 2015) (quoting *City of Harlingen v. Estate of Sharboneau,* 48 S.W.3d 177, 182 (Tex. 2001)). However, § 51.003 modifies the historical definition by specifying that "[c]ompetent evidence of value may include, but is not limited to," expert opinion testimony, comparable sales, anticipated marketing time and holding costs, cost of sale, and the necessity and amount of any discount to be applied to the future sales price or cashflow generated by the property.  TEX. PROP. CODE § 51.003(b).

14.     Thus, the Texas Supreme Court held that § 51.003(b) contemplates the use of a post-foreclosure sales price as competent evidence of fair market value.  *See PlainsCapital Bank*, 459 S.W.3d at 556.  In particular, the Texas Supreme Court held that evidence of a future sales price "will support a fair market value finding under [Texas Property Code § 51.003] even though that type of evidence might not otherwise be competent in the common or historical fair market value construct."  *Id.* at 556–57.  The Texas Supreme Court expressly declined to hold that "the future sales price" requires a "showing of comparable market conditions between the foreclosure sale and the future sale" because that "would be adding words to § 51.003."  *Id.* at 556.  Accordingly, evidence of a property's post-foreclosure sales price is admissible for purposes of § 51.003, regardless of the circumstances of the sale. *See id.*

15.     Here, after OWB foreclosed on the hotel, it paid $88,697.88 in *ad valorem* taxes due for 2009, and it paid another $62,647.01 in *ad valorem* taxes due for 2011.  OWB sold the hotel for $1.5 million a few months after foreclosure.  OWB received, net of the amounts it paid for taxes, approximately $1.3 million for the hotel.

16.     Notably, this amount is similar to Milkes' appraisal of $1,390,000 for "as is" value of the hotel.  Milkes' "as is" appraisal report was flawed, as this Court indicated in its

original opinion, but his methodology was consistent with the guidelines set forth in paragraph 3.10 deed of trust.  In addition, Massey testified that his valuation likely would have been similar to Milkes' appraisal if he had followed the guidelines in paragraph 3.10.

17.     None of the appraisals took into account the post-foreclosure sale price of the hotel.  Further, the appraisals by Galbraith and Massey were inconsistent with the valuation methodology set forth in paragraph 3.10 of the deed of trust as well as § 51.003, because their appraisals did not reflect the actual condition of the hotel at the time of foreclosure.  Their appraisals were based on the false assumption that the hotel had been repaired and its business stabilized.

18.     Based on the record before it, the Court concludes that the fair market value of the hotel was $1.3 million at the time of OWB's foreclosure.

### C. Attorney's Fees and Costs

19.     Finally, the Court addresses the issue of attorney's fees.  HNM and its members request an award for their pre-petition attorney's fees as actual damages caused by Pirani's breach of the settlement agreement.  They request an award of additional attorney's fees incurred post-petition for their successful counterclaim for breach of the settlement agreement.

20.     "Texas law distinguishes between [1] recovery of attorney's fees as actual damages and [2] recovery of attorney's fees incident to recovery of other actual damages."  *See Haubold v. Medical Carbon Research Inst., LLC*, No. 03-11-00115-CV, 2014 WL 1018008, at *6 (Tex. App.—Austin Mar. 14, 2014, no pet.) (quotations omitted).   Attorney's fees characterized as damages are compensatory and may be recovered through a successful cause of action.  *See In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 173 (Tex. 2013).   In contrast, "there can be no recovery of attorney's fees [not characterized as damages] unless

authorized by contract or statute," (commonly known as the American Rule). *Id.* at 172 (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006)).

21.     With respect to the recovery of attorney's fees incident to the recovery of actual damages, § 38.001(8) of the Texas Civil Practice and Remedies Code provides that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." *see* TEX. CIV. PRAC. & REM. § 38.001(8).

22.     The Texas Supreme Court recently explained the purpose of § 38.001(8) in *Ventling v. Johnson*, 466 S.W.3d 143, 155 (Tex. 2015):

> [C]hapter 38 "shall be liberally construed to promote its underlying purpose." Tex. Civ. Prac. & Rem. Code § 38.005. We have explained that this purpose is to "encourage contracting parties to pay their just debts and discourage ... vexatious, time-consuming and unnecessary litigation." *Gates v. City of Dallas,* 704 S.W.2d 737, 740 (Tex. 1986) (construing chapter 38's predecessor); *see also 1/2 Price Checks Cashed v. United Auto. Ins. Co.,* 344 S.W.3d 378, 388 (Tex .2011) ("Applying section 38.001 here would [promote its underlying purpose]—it would allow a plaintiff with a small but valid contract claim to recoup its full amount of damages, ... so that the aggrieved party may be put in as good a position as if the other party had fully performed." (internal quotation marks and citation omitted)).

23.     An award of attorney's fees for a successful suit for breach of contract is in the nature of a penalty or punishment for failure to pay a just debt. *Huff v. Fidelity Union Life Ins. Co.,* 312 S.W.2d 493, 501 (Tex. 1958).  *See also King v. Acker,* 725 S.W.2d 750, 757 (Tex. App.—Houston [1st Dist.] 1987, no writ) (noting that attorney's fees are not ordinarily an element of actual damages).

24.     To recover attorney's fees in a breach of contract suit, a party must (1) prevail on the underlying claim and (2) recover damages.  *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 172–73 (Tex. 2013).

25.     At the original trial, HNM and its members asserted an unliquidated counterclaim against Pirani for breach of the settlement agreement based on his failure to release them.  They sought, as actual damages, the attorney's fees and expenses they incurred in defending themselves from OWB's guaranty litigation in the state court.  They claimed as actual damages all of the time their attorney spent in the guaranty litigation from its inception through Pirani's post-dismissal motions.

26.     HNM's members succeeded on their underlying claim for breach of the settlement agreement.  This Court determined, and the Fifth Circuit affirmed, that Pirani breached his obligations under the settlement agreement by failing to release them from their guaranty obligations.  Pirani thereby embroiled HNM's members in continued litigation in the state court as well as this adversary proceeding.

27.     HNM's members clearly were damaged as a result of Pirani's failure to honor his promise to release them.  However, they are not entitled to all of their attorney's fees and expenses from the state court litigation as actual damages.  Pirani's breach of the settlement agreement occurred when Pirani acquired the debt and obtained the ability to release them but failed to do so.  That date was not the inception of OWB's guaranty litigation, but at or about the state court trial date on March 7, 2012.

28.     Porterfield testified that he spent approximately 60 hours from March 2012 through July 2012, for total fees of $21,000, defending his clients from Pirani's attempts to amend the dismissal order and pursue the guaranty litigation against them in state court. Porterfield, however, was not billing his clients for this time.

29.     The actual amount of attorney's fees and expenses paid by Porterfield's clients during this period was small due to their flat fee arrangement.  In addition, as partial payment of

Porterfield's ongoing attorney's fees and expenses, HNM and its members had assigned to Porterfield a 25% interest in their claims for payment from Pirani and Aziz under the agreed final judgment in the severed state court action.

30.    Thus, this Court finds and concludes that HNM's members have established a claim for actual, pre-petition damages in the amount of $1,000 for the expenses Porterfield billed to them after Pirani breached the settlement agreement.  These damages are in addition to the interest HNM and its members assigned to Porterfield in the agreed final judgment against Pirani and Aziz.

31.    As a result of their successful counterclaim, HNM and its members also seek to recover an award for the reasonable attorney's fees and expenses they incurred in this adversary proceeding pursuant to § 38.001(8) of the Texas Civil Practices and Remedies Code and paragraph 6.7 of the settlement agreement.  *See, e.g., In re Pride Companies, L.P.*, 285 B.R. 366, 371 (Bankr. N.D. Tex. 2002).

32.    Under Texas law, factors that a factfinder should consider when determining the reasonableness of a fee include:

>    (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
>    (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;
>    (3) the fee customarily charged in the locality for similar legal services;
>    (4) the amount involved and the results obtained;
>    (5) the time limitations imposed by the client or by the circumstances;
>    (6) the nature and length of the professional relationship with the client;
>    (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>    (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equipment Corp.* 945 S.W.2d 812, 818 (Tex. 1997).

21

33.     Here, Porterfield testified that he spent 377.2 hours (at $350 an hour), for total fees of $132,020, in this adversary proceeding pursuing his clients' counterclaim for breach of the settlement agreement.  This includes 291.4 hours through the first trial and 85.8 hours from remand through the hearing on remand.[6]  None of this time relates to their counterclaim for Pirani's breach of fiduciary duty.

34.     Porterfield's hourly rate is reasonable, and the amount of time he expended in this adversary proceeding was necessary and reasonable under the circumstances.  Further, Porterfield testified, credibly, that this protracted litigation has occasionally precluded him from taking on other work.

35.     However, Porterfield and his clients had a flat fee arrangement.  While a flat or contingency fee arrangement is not determinative of the reasonableness of requested fees, it is a factor this Court considers.  *See Rauscher Pierce Refsnes, Inc. v. Koeng,* 794 S.W.2d 514, 516 (Tex. App. -- Corpus Christi 1990, writ denied) (discussing a contingency fee arrangement).

36.     In this case, based on a flat fee arrangement of $4,000 per month, Porterfield would have received approximately $80,000 from his clients over the course of the litigation in this Court.[7]

37.     In addition, as partial payment of his fees, Porterfield received a 25% interest in his clients' claim against Pirani and Aziz for their failure to re-purchase HNM's membership interest for $475,000.  This claim is part of the agreed final judgment entered in the severed state court action.

---

[6] This time does not include any time spent on appeal.  As stated previously, HNM and its members intend to submit a separate request for their attorney's fees and expenses for the appeal.

[7] Pirani initiated this case on July 28, 2012, and the original trial occurred over several days in September 2013. Thus, under a $4,000 per month flat fee arrangement, Porterfield would have received $40,000 for 10 months through the first trial.  The Court received this proceeding on remand on September 19, 2016.  From that date through the hearings on remand 10 months later in July 2017, Porterfield would have received an additional $40,000 under a flat fee arrangement of $4,000 per month.  These calculations are exclusive of any amounts Porterfield might receive for his work on appeal.

38.     When the Court compares the amount HNM's members are requesting ($132,020) for their attorney's fees with their flat fee arrangement and the value of the interest they gave Porterfield in the agreed final judgment, the requested attorney's fees appear reasonable.

39.     With respect to expenses, Porterfield testified during the original trial that he incurred $3,411.77 in expenses during the adversary proceeding.  Porterfield did not submit documentation of additional expenses on remand, and he requested to address appellate fees and costs separately.

40.     For all these reasons, the Court finds and concludes that HNM's members are entitled to an award of actual damages in the amount of $1,000 as well as reasonable attorney's fees in the amount of $132,020 plus expenses in the amount of $3,411.77.  This award is exclusive of any attorney's fees and costs incurred on appeal.

## CONCLUSION

The Court concludes that HNM is liable to Pirani for its contributive share of $300,000, that is, $50,000.  The Court further concludes that, in addition to their judgment claim, HNM's members have established an unsecured claim for $1,000 in actual damages as well as for reasonable attorney's fees in the amount of $132,020 plus expenses in the amount of $3,411.77. The Court will enter a separate Order consistent with these Findings of Fact and Conclusions of Law on Remand.

Signed on 09/29/2017

*Brenda T. Rhoades*            SD

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE